Filed 1/30/26  In re P.M. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re P.M., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.M. et al., <br><br> Defendants and Appellants. | F089742 <br><br> (Super. Ct. No. 24JD0006) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County. Jennifer L. Giuliani, Judge.

K.M. et al., in pro. per., for Defendants and Appellants.

Lozano Smith and Laurie Avedisian-Favini; Thomas Y. Lin and Ana Dominguez, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

This appeal concerns a request for placement pursuant to California's statutory relative placement preference, made after the termination of reunification services but before the termination of parental rights. (Welf. & Inst. Code, § 361.3.)[1] In January 2024, then five-month-old P.M. was taken into protective custody following a referral for general neglect and substance abuse by W.M. (mother), and in February 2024, P.M. was adjudged a dependent of the juvenile court under section 300, subdivision (b). After mother's reunification services were terminated in August 2024 and this matter was set for a selection and implementation hearing under section 366.26, maternal grandfather K.M. and maternal stepgrandmother Ka.M. (maternal grandparents) requested placement of P.M. under section 361.3 and then filed a section 388 petition seeking to change P.M.'s placement from the nonrelative caregivers and de facto parents (de facto parents) with whom he has resided since being taken into protective custody.

At a contested hearing, the juvenile court concluded the relative placement preference did not apply at that stage in the dependency proceeding, found changing P.M.'s placement was not in his best interest, and denied maternal grandparents' section 388 petition. The court then terminated parental rights and ordered adoption as P.M.'s permanent plan under section 366.26.

Maternal grandparents timely appealed. They claim that Kings County Human Services Agency/Child Protective Services (agency) failed to discharge its family finding duties under section 309 and rule 5.637(b) and (d) of the California Rules of Court;[2] the juvenile court failed to make the requisite due diligence findings under rules 5.637(d) and 5.695(e); and the juvenile court erred when it failed to apply the relative placement

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    All further references to rules are to the California Rules of Court.

2.

preference under section 361.3 and instead applied the caretaker placement preference under section 366.26, subdivision (k)(1). Maternal grandparents also claim the agency failed to show that placement with them would be detrimental to P.M. Maternal grandparents seek reversal of the juvenile court's order denying their section 388 petition and immediate placement of P.M.[3]

The agency contends the relative placement preference under section 361.3 does not apply after termination of reunification services, but the error was harmless because the juvenile court nevertheless considered the relevant factors. Further, the agency contends the court did not abuse its discretion in denying the section 388 petition. The agency concedes failure to exercise due diligence with respect to its family finding efforts, but contends there is no authority supporting placement of P.M. with maternal grandparents as a remedy for its earlier errors, and there is no authority for the proposition that the agency must show it would be detrimental to place P.M. with maternal grandparents.[4]

We recognize that maternal grandparents were misled by mother, they were concerned once they learned her rights were set to be terminated, and they acted swiftly once they became aware of the situation. We also recognize the agency's efforts to

---

[3] Maternal grandparents also point out that during the hearing held on November 27, 2024, the juvenile court judge disclosed she previously represented maternal grandfather in a family law matter many years before, but had only a very vague recollection of the matter. Maternal grandparents acknowledge they did not foresee any conflict of interest then, but now question that conclusion. However, maternal grandparents do not develop a claim for relief based on this issue, and, in any event, their failure to raise the issue in the lower court forfeits appellate review. (E.g., *North American Title Co. v. Superior Court* (2024) 17 Cal.5th 155, 166; *Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038.)

[4] In their reply brief, maternal grandparents concede the agency is not required to prove that *placing* P.M. with them would be detrimental to him, but they argue the agency's position on that point is inconsistent given its argument that *removing* P.M. would be detrimental to him. It is unnecessary to address maternal grandparents' detriment argument given their concession, and we confine our analysis to the established legal standards governing the relative placement preference and section 388 petitions.

identify, locate, and notify relatives earlier in the proceeding were deficient, as the agency concedes. This difficult situation was entirely avoidable had the agency acted with due diligence in discharging its family finding duties earlier in the proceeding. We cannot emphasize enough how critical it is for the agency and the juvenile court to ensure they timely fulfill their duties in this regard. However, as discussed *post*, we do not have jurisdiction to review earlier events, findings, and orders, which were not challenged and are now final.

We are limited to determining whether the juvenile court erred with respect to its adjudication of maternal grandparents' section 388 petition seeking placement of P.M. Although maternal grandparents urge that the relative placement preference applies until parental rights are terminated, the law instead reflects general agreement on application of the preference through the reunification phase of dependency proceedings, whether or not a new placement is required. (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 592–593 (*Maria Q.*).) Some courts have recognized a limited exception and applied the preference "after the reunification period where the relative has come forward seeking placement of the child during the reunification period and the agency has ignored the relative's request for placement." (*Id.* at p. 593, citing *In re Isabella G.* (2016) 246 Cal.App.4th 708, 723 (*Isabella G.*); accord, *In re N.J.* (2024) 104 Cal.App.5th 96, 130 (*N.J.*).) This case, however, does not fall within that limited exception because maternal grandparents did not seek placement of P.M. until after reunification services were terminated, despite learning of the dependency proceeding during the reunification phase. Under these circumstances, where a new placement for P.M. was not required, we find no error in the juvenile court's determination that the relative placement preference did not apply. Nevertheless, assuming it applied, any error was harmless because the court considered the statutory factors and there is not a reasonable probability of a different outcome absent the error.

We also find no error with the juvenile court's determination that changing P.M.'s placement from his stable placement with de facto parents to maternal grandparents, who reside out-of-state and who did not have a relationship with him prior to learning mother's rights were set to be terminated, was not in his best interests. (§ 388.) At that stage in the proceedings, the focus was P.M.'s need for permanency and stability, and the court's best interests determination accounted for that focus, as it must. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) As discussed herein, the record in this case was well developed on the relevant issues and the court duly considered the evidence in determining that it was in P.M.'s best interests to remain with de facto parents. This determination may be disturbed "only in the rare case when the court has made an arbitrary or irrational determination." (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194–1195, citing *Stephanie M., supra*, at p. 318 & *In re I.B.* (2020) 53 Cal.App.5th 133, 152.) The determination does not turn on "whether substantial evidence would have supported a different order, [and we may not] reweigh the evidence and substitute our judgment for that of the juvenile court." (*Matthew M., supra.* at p. 1195, citing *Stephanie M.* at p. 319.) Accordingly, we conclude the juvenile court did not abuse its discretion when it denied maternal grandparents' section 388 petition and we affirm the decision.

## FACTUAL AND PROCEDURAL SUMMARY

### I.      Earlier Proceedings

P.M. was born in July 2023, and the agency received a referral because mother tested positive for methamphetamine three times during pregnancy. The referral was closed as inconclusive based on mother's negative test results while in the hospital.

In December 2023, the agency received a second referral for general neglect based on mother's alleged admission to drug and alcohol use, driving while under the influence, and leaving then five-month-old P.M. with random people. In January 2024, while the second referral was under investigation, the agency received a third referral and removed

P.M. from mother's home. P.M. was placed in foster care with nonrelative caregivers, with whom he remains.

On January 10, 2024, the juvenile court held a detention hearing. The court found R.E. and A.S. to be P.M.'s alleged fathers, found a prima facie showing had been made that P.M. came within section 300, subdivision (b), and ordered P.M. detained from mother and placed in the temporary custody of the agency.

On February 14, 2024, the juvenile court held a combined jurisdiction and disposition hearing. The court sustained the petition allegations and found P.M. as described by section 300, subdivision (b); adjudged him a dependent of the court; removed him from mother's physical custody; and ordered reunification services for mother. The court scheduled a paternity review hearing for March 27, 2024, and a six-month review hearing for August 7, 2024.

On March 27, 2024, the juvenile court found R.E. was not P.M.'s biological father and excluded him from the case.

On June 5, 2024, P.M.'s nonrelative caregivers were granted de facto parent status.

On August 7, 2024, the juvenile court held a six-month review hearing. The court found that mother failed to participate regularly and make substantive progress in the court-ordered treatment programs and that return of P.M. to her care would create a substantial risk of detriment to him. The court found the agency provided or offered reasonable services to mother and terminated mother's reunification services. The court set the section 366.26 hearing for the selection and implementation of a permanent plan on November 27, 2024.

## II. Maternal Grandparents' Contact With Agency and Section 388 Petition

Sometime around October 11, 2024, maternal stepgrandmother contacted the agency and spoke with social worker M.H. (SW). Maternal stepgrandmother told SW that she and maternal grandfather, who live in Idaho, were interested in having P.M.

placed with them and in adopting him. Maternal stepgrandmother said they just became aware that mother was not going to reunify with P.M. and that he was going to be adopted.

On October 22, 2024, the agency initiated the Interstate Compact for the Placement of Children (ICPC) process.

On October 25, 2024, maternal grandparents met with SW via video call, and SW completed an assessment and gathered information for the ICPC.

On November 1, 2024, the ICPC was submitted to the State of Idaho.

On November 21, 2024, maternal stepgrandmother had a video visit with P.M.

On November 25, 2024, the State of Idaho approved maternal grandparents' home for placement.

On November 26, 2024, maternal grandparents filed a petition under section 388 (Judicial Council Forms, form JV-180) requesting a change to the juvenile court's disposition order and a hearing on relative placement preference under section 361.3, and a relative information form (Judicial Council Forms, form JV-285).

## III.  Combined Section 388 and Section 366.26 Hearing

### A.  Continuances

On November 27, 2024, at the section 366.26 hearing, mother was in custody and present, and counsel for the agency, mother, alleged father A.S., and P.M. were prepared to submit on the agency's section 366.26 report. Counsel for maternal grandparents requested the juvenile court review the section 388 petition requesting relief under section 361.3 before making any findings under section 366.26, given the lack of notice to maternal grandparents. The juvenile court set a contested hearing for the section 388 petition on January 16, 2025, ordered the agency to prepare a report, and continued the section 366.26 hearing to that date in a contested posture.

On January 16, 2025, the juvenile court granted maternal grandparents' request for a continuance and denied their request for immediate placement of P.M. Additionally,

7.

the agency requested a continuance based on new information relevant to the agency's inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.), and both the agency and P.M.'s counsel planned to partially object to maternal grandparents' petition for access to the juvenile case file (Judicial Council Forms, form JV-570), filed on January 10, 2025.  The court continued the section 388 petition and section 366.26 hearings to March 11, 2025.

On March 11, 2025, the juvenile court continued the hearings to April 22, 2025, given the need to review, redact and release the records sought by maternal grandparents relating to placement and the best interests of P.M.

Beginning on April 22, 2025, the juvenile court held a two-day hearing on maternal grandparents' request for placement of P.M. under sections 361.3 and 388, and, after denying their request, proceeded with the section 366.26 hearing.  The court terminated the parental rights of mother, alleged father A.S., and all unknown and biological fathers of P.M., and ordered adoption as his permanent plan.

B.     **Agency's Reports**

1.     **Initial Placement Assessments**

In advance of the combined hearings, the agency prepared a response to maternal grandparents' section 388 petition and an addendum report relating to the section 366.26 hearing.  P.M. remained in the care of de facto parents, with whom he had resided since his detention in January 2024, and the agency disputed the applicability of section 361.3 and recommended maternal grandparents' section 388 petition be denied.

The agency's response and addendum report documented that four potential placements for P.M. were considered prior to maternal grandparents' request for placement.  M.J. (maternal grandmother) did not meet the requirements for emergency placement, but she was involved in P.M.'s life and was an active participant throughout the dependency proceeding.  Maternal grandmother submitted a placement application

days after P.M. was taken into protective custody. However, she withdrew her application in March 2024 due to background check issues.

M.A. and C.A. (the A.'s) also applied for placement days after P.M. was taken into protective custody. They were not related to P.M. and knew mother through church. They babysat P.M. twice, but did not have a significant relationship with him or the family. They engaged in bible study with mother and were working on building a relationship with her. In late January 2024, Mr. A. stated he was not interested in adopting P.M., but was willing to provide care. In early February 2024, Mrs. A. stated that after discussing the matter, they were willing to adopt P.M. At that point in time, mother reported she wanted Mrs. A. to have placement of P.M. because she and maternal grandmother were not getting along. In March 2024, mother reported she wanted J.Z. to have placement rather than Mrs. A. because of religious concerns that had arisen. Shortly thereafter, Mrs. A. had a visit with mother and P.M. In late April 2024, a social worker told Mrs. A. the agency was not going to place P.M. with them because there were no concerns with his current placement, and the A.'s withdrew their placement application.

J.Z. and R.Z. (the Z.'s) applied for placement in March 2024. They were also unrelated to P.M. Mrs. Z. was mother's counselor during her pregnancy, and in February 2024, mother told an agency social worker she planned to ask Mrs. Z. to apply for placement. The social worker informed mother the Z.'s could apply, but the agency was not planning to move P.M. In March 2024, the Z.'s applied for placement, and in May 2024, Mrs. Z. said she supported P.M.'s reunification with mother, but was willing to adopt him if necessary. The Z.'s saw P.M. a couple of times before he was taken into protective custody, and Mrs. Z. visited P.M. once with mother after he was detained. Mother told a social worker she preferred P.M. stay with de facto parents because he had a strong relationship with them, he was safe, and there were no concerns. As of November 2024, the Z.'s placement application remained pending, and they had not completed the steps for approval or denial.

9.

In addition to these requests for placement, mother identified H.M. (maternal aunt) as a possible placement after P.M. was detained, but the next day, mother reported that maternal aunt did not want to be considered. The addendum report also reflected that during the agency's investigation of the second referral received in December 2023, mother mentioned she sometimes left P.M. with Sa.M., but no one named Sa.M. applied for placement.

### 2. Maternal Grandparents' Contact With Agency

Sometime around October 11, 2024, maternal stepgrandmother contacted the agency and requested placement of P.M. She reported she and maternal grandfather reside in Idaho and had been married for approximately 11 years. Maternal grandfather had three adult children, maternal stepgrandmother had one adult child and one minor child, and they had four minor children together who resided with them. They live on a dairy farm with numerous animals and homeschool their children, with one parent working outside the home full-time and the other parent staying at home to take care of the children and the dairy. They had recently switched roles, with maternal stepgrandmother, who is a registered nurse with a background in pediatrics, now staying home and maternal grandfather working outside the home.

Maternal grandparents became aware in June or July 2024 that P.M. had been detained by child protective services (CPS), but mother told them she was doing well and in the process of reunifying with him. However, in October 2024, mother notified them that her parental rights were going to be terminated and P.M. was going to be adopted. Mother told them she supported their pursuit for placement and adoption of P.M. Maternal grandfather notified SW that his mother, S.M. (maternal great-grandmother) had guardianship of mother's older son, A.G. Maternal grandfather confirmed he is mother's biological father and reported he heard from her five to 10 times a year.

The addendum report reflected that mother identified maternal grandfather by name to the agency several days after P.M. was taken into temporary custody. However,

the petition response stated that mother reported she did not have contact with him, he was hard to get along with, and he had anger issues. Mother also reported she had a CPS history from her childhood, with maternal grandfather and maternal grandmother making allegations against one another. She described maternal grandfather as "super strict," and she said she and her brother had been removed from maternal grandfather's care due to physical marks on them, she witnessed him perpetrating acts of domestic violence, and he restricted or denied food and spanked them with objects for discipline.

The petition response documented three CPS referrals during mother's childhood involving maternal grandfather, one for possible physical abuse, one alleging general neglect, and one for possible emotional abuse, all of which were found inconclusive. The response also reflected maternal grandfather had a criminal history that included inflicting injury on a child in 2002 and inflicting corporal injury in 2005, but he had no criminal history after 2005.[5]

In a November 2024 interview documented in the addendum report, mother denied maternal grandfather was ever physically or emotionally abusive. She said her parents, primarily maternal grandmother, fought with one another resulting in the CPS referrals; and maternal grandfather had rules while maternal grandmother did not, which felt unbearable to the children at the time and caused issues when they returned to maternal grandfather's house from maternal grandmother's house. Mother said she did not notify maternal grandfather when P.M. was detained because she thought she would get him back, and she expressed her preference that he be placed with maternal grandparents because they are family. In January 2025, mother denied that she told agency social workers she did not want maternal grandfather involved or they had a troubled

---

[5]    Other agency documentation reflected one conviction for domestic violence in 2005 that did not involve either maternal grandmother or maternal stepgrandmother, with no mention of a 2002 conviction.

relationship. Mother said, "she was not in the right state of mind then and … want[ed] [P.M.] to be raised by family."

Maternal grandparents had no contact with P.M. prior to October 2024, but since contacting the agency, maternal stepgrandmother had a video visit with P.M. in November 2024 in which she did well attempting to engage with him.[6] P.M. did not engage, but in addition to his young age, he was screened shortly thereafter for, and found to be at high risk for, autism. He was observed by social workers to be quiet and noninteractive with people he was not familiar with, but "sweet, cuddly, affectionate, and happy with" de facto parents.[7]

Also in November 2024, SW reached maternal great-grandmother by phone and she confirmed she had custody of A.G. She reported A.G. was upset to learn P.M. was in foster care, and he wanted maternal great-grandmother to take placement of P.M., but she stated she was too old to raise another child.

In December 2024, maternal grandparents had a video visit with P.M. They attempted to engage with him, unsuccessfully. SW subsequently notified maternal grandparents of the agency's decision to leave P.M. in the care of de facto parents based on his attachment to them and stability in the placement, the absence of a bond or connection with maternal grandparents, and the absence of a relationship with them prior to his removal or since they found out he was in foster care in June or July 2024.

In February 2025, maternal stepgrandmother had a video visit with P.M. and did well attempting to engage him. In March 2025, she had another video visit with P.M. and he appeared to have fun, playing with toys and hiding behind the sofa.

---

[6]     Maternal grandfather was in training for a new job, so the agency offered evening and weekend visits in an effort to accommodate his schedule.

[7]     P.M. subsequently began receiving developmental services.

### C. Hearing Testimony[8]

#### 1. Social Worker

In August or September 2024, P.M.'s case was transferred to the adoption unit and assigned to SW. SW received a call from maternal stepgrandmother in mid-October 2024 requesting placement of P.M. and, over several weeks, SW discussed the process with maternal stepgrandmother. SW testified the agency had assessed people for possible placement who either were identified by mother or contacted the agency, and she acknowledged the agency did not send family finding letters because the social worker assigned to the case at that time, L.H., was not familiar with the process and proceeded only on information mother provided. SW also acknowledged this omission was documented only in the addendum report submitted prior to the April 2025 combined hearing.

SW testified that P.M. had been in a stable placement with de facto parents since his detention, he had bonded with them, his needs were being met "above and beyond," and maternal grandfather did not have any relationship with P.M. prior to maternal stepgrandmother requesting placement when P.M. was 15 or 16 months old, despite maternal grandparents' awareness that P.M. had been removed from mother's care in June 2024. SW also testified that the agency offered evening and weekend video visits to accommodate maternal grandfather's work schedule, but he did not avail himself of that opportunity and only attended one visit. Although P.M. was young enough he likely would not later remember if he was removed from his placement with de facto parents, SW explained it was not in his best interest to be traumatized through a placement change given that he had been deemed high risk for autism and he was receiving 15 hours of in-home developmental services, he had difficulty adjusting to new people, and he liked

---

[8] We do not include a summary of Mrs. Z.'s testimony because it is not relevant to resolution of maternal grandparents' claims.

routine. Further, de facto parents consistently expressed understanding the importance of keeping P.M. connected to mother and maternal grandmother, with whom he had ongoing relationships through visits, and de facto parents were open to creating relationships with extended family members P.M. did not yet know. For those reasons, the agency concluded it would not be in P.M.'s best interest to change his placement from de facto parents to maternal grandparents.

SW acknowledged that in March 2025, P.M. started becoming more responsive to maternal stepgrandmother during video visits, and he might adapt through multiple visits and a transition. SW was aware maternal stepgrandmother reported she was an elementary school teacher and a registered nurse who had worked in a neonatal intensive care unit, and she cared for her children's medical needs at home. SW testified that due to P.M.'s high needs level, the presence of five other children in maternal grandparents' home caused some concern. Mother's statements concerning the absence of a relationship with maternal grandfather, her inability to get in touch with him, and the issues she reported having with him were also concerns.

### 2. Licensed Therapist

Brenna Kantner, a licensed marriage and family therapist with experience as an El Dorado County CPS social worker, testified about her experience and training related to the relative placement preference, the due diligence requirement, and the methods available to social services for locating family members and their addresses. Based on her review of available records, the agency did not satisfy the due diligence requirement under sections 361.3 and 309, and even if maternal grandparents had reached out at the time of detention, when section 361.3 clearly applied, the agency had no intention of moving P.M. Kantner also testified that based on the information she was provided, maternal grandparents would be a good fit for P.M., as they were willing to provide him with a biological family connection, they were equipped to handle his needs given maternal stepgrandmother's medical and educational background and her access to

14.

resources, and they were capable of managing his transition.  In her opinion, family culture was very important, and because P.M. had family members who wanted him, severing those ties did not appear to serve him well.

### 3.        Maternal Stepgrandmother

Maternal stepgrandmother and maternal grandfather married in 2013, and maternal stepgrandmother met mother in 2014.  She testified mother and maternal grandfather had an ongoing relationship and he was a primary provider of support for mother, but their relationship went through periods of interruption when mother was not sober.  Mother informed maternal grandfather she was pregnant later in the pregnancy and her contact with him was sporadic.  Maternal stepgrandmother explained that when mother was using drugs, her phone would become disconnected and they could not reach her until she called again from a new number, usually to ask for help; and this was an ongoing pattern.

Maternal stepgrandmother had degrees in Christian ministry, child development, nursing and business administration, and she had worked as a childcare director, first grade teacher, and registered nurse trained in neonatal intensive care and pediatric intensive care.  She and maternal grandfather had five children living at home, including six-year-old twins who required in-home occupational, speech, and physical therapy due to their premature births.  Maternal stepgrandmother clarified that she is able to handle her children's basic medical needs at home with her experience, but is not against traditional medical care and is willing to access that care when necessary.

In late June 2024, mother informed maternal grandfather that P.M. had been removed from her care, but she expected to have him back by the end of July.  They did not intervene because mother said she was doing everything she could to get him back and they were hopeful that was true.  At some point in July, mother told maternal grandfather she hoped to have P.M. back in August, but she did not contact them again until October, when her parental rights were going to be terminated.  When maternal grandfather expressed lack of understanding as to why the process was happening so

15.

quickly, mother acknowledged P.M. had been removed earlier than she had indicated. They learned the hearing was in November, discussed the matter, and called mother back to inform her they were interested in adopting P.M. At that time, maternal stepgrandmother had just submitted her resignation to the hospital where she worked to stay home with the children, and maternal grandfather was scheduled to begin job training. Maternal stepgrandmother said mother was relieved and asked them to move forward. Maternal stepgrandmother called the social worker the same day, which she recalled was October 9 or 10, 2024, and then followed with a call to Idaho Department of Health and Welfare to start the ICPC process.

In under six weeks, maternal grandparents completed the home study and licensing requirements. In or around December 2024, SW informed maternal grandparents via video call that the agency was not going to recommend placing P.M. with them.

Maternal stepgrandmother had monthly video visits with P.M., which she described as enjoyable, and she said P.M. interacted more with her the last three visits. She also asked SW about meeting P.M. in person, but her request was denied because she was not a biological relative. When she asked a second time in January 2025, SW told her that if she was in the area, they would try to arrange something.

Maternal stepgrandmother testified they were prepared to offer P.M. a permanent home and they strongly believed he should be with family. Mother would be welcome as a family member when safe and appropriate. If she was using or under the influence of substances, however, it would not be safe or appropriate.

### 4. Maternal Grandfather

Maternal grandfather testified that his relationship with mother was "[p]retty sketchy" over the past five years. They talked almost daily during the approximately one-year period she was doing well, and she visited twice. Her pattern was to do well for a while and then break off contact when she was using drugs and alcohol. She would

16.

then call again when she began to struggle with fear and anxiety, and she would get better for a time.

In July or August 2024, mother contacted maternal grandfather and told him she was not doing well and had lost custody of P.M., but she indicated she was going to get him back. Maternal grandfather did not realize things had progressed as far as they had, and in October 2024, he learned mother was not going to regain custody of P.M. After he and maternal stepgrandmother discussed the matter and decided to seek placement of P.M., he informed mother and asked if she had any objections. She said no and she thanked him. He made it clear to her that if they got custody of P.M., they would decide the extent of her contact with him and she could not be around them if she was on drugs. She agreed to that.

Maternal grandfather testified that he was convicted of domestic violence in 2005 following a fight with his girlfriend at the time. He was not convicted of any crimes based on the incidents documented in the agency's reports and there were no allegations of domestic violence after 2009.

Maternal grandfather testified he had two video visits with P.M. In December 2024, he started working as a truck driver during the week and asked for weekend visits, but did not receive any response. He believed it was in P.M.'s best interest to be placed with them because he was part of their family, and they were prepared to meet his needs.

### D.    Court's Ruling

During argument following witness testimony, maternal grandparents' counsel identified *Isabella G.* as key to their position for placement given the agency's failure to follow its protocols, and argued that mother misled maternal grandparents, but they took swift action as soon as they learned she was unlikely to regain custody. Counsel also argued that a need for a placement change was not required to trigger the relative placement preference.

Agency counsel argued that *Isabella G.* was distinguishable because it involved a relative who sought placement pre-disposition and maternal grandparents sought placement late in the proceedings. As a result, their request for placement must be assessed in light of P.M.'s concurrent plan and his best interests.

P.M.'s counsel acknowledged the agency's failure to discharge its family finding duties and stated that although maternal grandparents failed to reach out to the agency when they learned P.M. had been removed, that did not excuse the agency's failure to discharge its duties under section 309, subdivision (e), and rule 5.637. Counsel noted the court could consider whether the agency was required to notify maternal grandparents given the past domestic violence allegations and CPS referrals, and it was not required to do so if it found there would be a danger to the child. However, if the court concluded notice was required, the question of what was in P.M.'s best interests was a difficult one. De facto parents loved him and were providing exceptional care, but maternal grandparents also appeared equipped to provide him with love and necessary care.

Mother's counsel stated mother's wish was for P.M. to be placed with maternal grandparents.

Counsel for alleged father, who had not been a participant to the proceedings, submitted.

In a detailed ruling, the juvenile court found that although the agency assessed relatives and nonrelatives for placement based on information mother provided, the agency's investigation was deficient. The court noted that mother vacillated over her preferred placement for P.M. throughout the proceedings, and that maternal grandparents did not timely seek placement during the reunification phase after they learned of the dependency proceeding in June 2024. Based on their failure to seek placement or otherwise participate during that phase, the court found maternal grandparents had not shown the agency's error in failing to comply with section 309 was prejudicial.

The court discussed the relative placement preference under section 361.3, the decisions in *Maria Q.* and *J.Y.*, and the split of appellate authority concerning when and under what circumstances the relative placement preference applies, postdisposition. (*In re J.Y.* (2022) 76 Cal.App.5th 473 (*J.Y.*).) The court discussed the factors under section 361.3, acknowledging that mother would like P.M. placed with maternal grandparents, there was no reason to believe maternal grandparents were not of good moral character or would not be able to provide for P.M. in their home, and there were no concerns about safety in their home or their ability to care for P.M. (*Id.*, subd. (a)(2), (5), (7)(A)–(C), (8)(A).) However, the court found that removing P.M. from his current home was not in his best interest. The court noted the relative placement request was made after termination of reunification services and the setting of the selection and implementation hearing, there was no need to change P.M.'s placement because he was in a stable, loving home with de facto parents who wanted to adopt him, and maternal grandparents were essentially strangers to P.M. (*Id.*, subd. (a)(1), (6).) The court denied maternal grandparents' petition requesting placement of P.M.

Turning to section 366.26, the juvenile court terminated the parental rights of mother, alleged father A.S., and all other unknown biological and alleged fathers; and selected a permanent plan of adoption for P.M.

## DISCUSSION

### I. Scope of Appellate Review

As an initial matter, maternal grandparents advance arguments concerning the failure by both the agency and the juvenile court to discharge their duties to ensure P.M.'s relatives were identified, located, and notified following his placement in protective custody and subsequent removal from mother's custody. They also argue the juvenile court failed to make a due diligence finding at the disposition hearing, and they request this court review all of the proceedings in this case, including the evidence they were not permitted access to given the confidential nature of dependency proceedings and

the juvenile court's discovery rulings. (See *In re B.F.* (2010) 190 Cal.App.4th 811, 818 [juvenile court records generally confidential and access to case file restricted under § 827].) Discussed next, this broad request and related claims of error concern events and orders that are final. As such, we lack jurisdiction to consider these events and orders, and we confine our analysis in this appeal to maternal grandparents' request for placement of P.M. and their section 388 petition.

## A. Family Finding Duties

"The California Legislature has expressed a strong preference to place children who have been detained from their parents with family members whenever possible." (*N.J., supra*, 104 Cal.App.5th at p. 102.) To that end, beginning when a child is detained, agency social workers are required to exercise due diligence in identifying, locating and notifying the child's relatives and kin. (§ 309, subds. (a), (e); rule 5.637(b), (d)(1).) The duties imposed on social workers and the juvenile court are both statutory and rule-based. (E.g., § 309, subds. (a), (e); rules 5.637(b), (d)(1), 5.695(a), (e); *In re K.B.* (2023) 97 Cal.App.5th 689, 697–698 (*K.B.*) [describing duties].) For the purpose of addressing maternal grandparents' first claim, it is sufficient to observe that social workers have an ongoing duty to exercise due diligence in family finding efforts, and the juvenile court must make a finding that the social workers have done so. (Rule 5.637(a)(1), (b), (d)(1); *K.B., supra*, at pp. 696–697.)

At the disposition hearing, "Whenever a child is removed from a parent's or guardian's custody, the court shall make a finding as to whether the social worker has exercised due diligence in conducting the investigation, as required pursuant to paragraph (1) of subdivision (e) of Section 309, to identify, locate, and notify the child's relatives, including both maternal and paternal relatives." (§ 358, subd. (b)(2).) The Rules of Court further provide, "If the child is removed, the court must consider and determine whether the social worker has exercised due diligence in conducting the required investigation to identify, locate, and notify the child's kin. The court must

consider the mandatory activities listed in rule 5.637 (d)(2) and may consider the additional activities listed in rule 5.637 (d)(3) in determining whether the agency has exercised due diligence in family finding.  The court must document its determination by making a finding on the record."  (Rule 5.695(e)(1).)  "If the court finds that the social worker has not exercised due diligence, the court may order the social worker to exercise due diligence in conducting an investigation to identify, locate, and notify the child's kin—except for any individual the social worker identifies as inappropriate to notify under rule 5.637 (e)—and may require a written or oral report to the court."  (*Id.*, (e)(2).)

### B.       Jurisdictional Limitation

Although maternal grandparents challenge the agency's and the juvenile court's failure to discharge their statutory duties concerning identifying, locating, and notifying P.M.'s relatives, this appeal is necessarily limited to their challenge to the applicability of the relative placement preference under section 361.3, requested by them in October 2024, and the denial of their section 388 petition, filed in November 2024.  First, "'A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment.'" (*In re S.B.* (2009) 46 Cal.4th 529, 531–532, quoting § 395, subd. (a)(1).)  "The dispositional order is the 'judgment' referred to in section 395, and all subsequent orders are appealable.  [Citation.]  "'A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order."  [Citation.]'"  (*S.B., supra*, at p. 532.)  The juvenile court's earlier disposition order and order terminating reunification services were not appealed and are, therefore, final and not reviewable.  (E.g., *K.B., supra*, 97 Cal.App.5th at p. 695 [a mother timely appealed dispositional finding that agency exercised due diligence to identify locate, and contact children's relatives, resulting in reversal and remand]; *In re A.K.* (2017) 12 Cal.App.5th 492, 500–502 [applying forfeiture to the father's claim, posttermination of parental rights, for failure to comply with §§ 361.3,

21.

309, subd. (e), where the father could have but did not object earlier in juvenile court and on appeal].)  Moreover, finality aside, maternal grandparents have no standing to challenge the agency's actions in connection with earlier placement requests made by the A.'s or the Z.'s, or to challenge earlier orders of the juvenile court.  (*In re K.C.* (2011) 52 Cal.4th 231, 236 ["Not every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal."].)

Thus, while the agency's failure to discharge its statutory duties is relevant to our analysis of maternal grandparents' relative placement preference claim, this appeal does not entitle them to challenge earlier orders or reopen prior proceedings.  Accordingly, we turn to maternal grandparents' claim that the juvenile erred when it found the statutory relative placement preference did not apply.

## II.     Statutory Relative Placement Preference

### A.      Legal Principles

"The purpose of California's dependency law is 'to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.'  (Welf. & Inst. Code, § 300.2, subd. (a).)  In its effort to achieve this overarching goal, the law balances a number of vital interests:  children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members. [Citations.]

"Dependency proceedings span up to four stages:  jurisdiction, disposition, reunification, and permanency.  [Citations.]  At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm.  (Welf. & Inst. Code, § 300.)  At the

22.

dispositional stage, the court decides if the child can be returned to, or must be removed from, a parent's custody.  (Welf. & Inst. Code, §§ 315, 319.)  During the reunification stage, qualifying parents are offered services to address the causes that led to the loss of custody.  (*Id.*, § 361.5, subd. (a).)  Finally, if the child cannot be safely returned to the parent within a statutorily specified timeframe, the juvenile court proceeds to the permanency stage, where it either terminates parental rights and places the child up for adoption or it selects another permanent plan, such as placement with a guardian or in long-term foster care.  (§ 366.26.)  Throughout the proceedings, the juvenile court is instructed to pay careful attention to the well-being of the child, the efforts of the parent, and the services provided by the state to ensure that cases proceed to this final stage only when necessary."  (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 623–624, fn. omitted.)

Within the overall dependency scheme lies a statutory relative placement preference, which provides, "In any case in which a child is removed from the physical custody of their parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, .…" (§ 361.3, subd. (a).)  Determining whether placement with a relative is appropriate requires the social services agency and the juvenile court to consider a set of enumerated factors, although consideration is not limited to those factors.  (*Ibid.*)  "'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated."  (*Id.*, subd. (c)(1).)

"At the outset of the case and during the reunification period, the agency and juvenile court are required to give 'preferential consideration' to a relative's request for placement, which means 'the relative seeking placement shall be the first placement to be considered and investigated.'"  (*Maria Q., supra*, 28 Cal.App.5th at p. 591, quoting § 361.3, subd. (c)(1) & citing *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032.)  "The statute does 'not supply an evidentiary presumption that placement with a

relative is in the child's best interests' but it does require the social services agency and juvenile court to determine whether such a placement is appropriate, taking into account multiple factors including the best interest of the child, the parents' wishes, and the fitness of the relative." (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295, fn. omitted (*R.T.*), quoting *Stephanie M., supra*, 7 Cal.4th at p. 320.)

## B. Applicability of Relative Placement Preference

### 1. Parties' Positions

The parties disagree whether the relative placement preference applies after the termination of reunification services but before the termination of parental rights where, as here, there is not a need for a new placement.[9]  Maternal grandparents argue the relative placement preference applies prior to the termination of parental rights, they were entitled to application of the preference, and the juvenile court instead required them to show that, under section 388, a new placement was necessary and in P.M.'s best interest, prejudicing them.[10]  In support of their argument, maternal grandparents rely on the decision in *Isabella G.*, which applied the relative placement preference between the termination of reunification services and the termination of parental rights.

The agency disputes that the relative placement preference applies, postreunification, and cites the decision in *J.Y.*, in which the appellate court found the juvenile court abused its discretion when it ordered a placement change to relatives who sought placement later in the proceedings, absent evidence the change was in the child's best interest.  (*J.Y., supra*, 76 Cal.App.5th at p. 476.)

---

[9]  "The interpretation of a statute and its application to undisputed facts is a question of law. [Citation.]  A question of law is subject to de novo review, giving no deference to the trial court's ruling." (*In re D.P.* (2023) 92 Cal.App.5th 1282, 1292 (*D.P.*).)

[10]  Maternal grandparents do not develop a due process claim, but they assert the agency's failures "effectively" denied them due process.  However, "grandparents, in their capacity as grandparents and without more, [generally do not] have a constitutionally protected interest in their relationship with the grandchild." (*In re C.P.* (2020) 47 Cal.App.5th 17, 27; accord, *In re R.J.* (2008) 164 Cal.App.4th 219, 225.)

We agree with maternal grandparents that *J.Y.* is distinguishable on the basis that the appellate court found full compliance by the agency in assessing relatives, whereas here, the agency failed to discharge its statutory and rule-based duties to identify, locate, and notify relatives of P.M.'s detention. However, we also find that *Isabella G.* is distinguishable and conclude the limited exception for late application of the relative placement preference recognized in *N.J.*, *Isabella G.*, and *R.T.* does not apply in view of the facts in this case.

## 2. Analysis

Some courts have stated that the relative placement preference applies only through disposition unless a new placement is required. (*D.P., supra*, 92 Cal.App.5th at p. 1293; *In re M.H.* (2018) 21 Cal.App.5th 1296, 1303; *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854 (*Lauren R.*).) Resolution of the issue in this case does not depend on whether the preference applies, absent need for a new placement, only through disposition or whether it instead applies through reunification, and the agency does not specifically argue for the narrower interpretation. Nevertheless, we observe that the aforementioned cases do not analyze that statutory issue and, procedurally, the question of relative placement preference was litigated, as in this case, after reunification services were terminated and a section 366.26 hearing set. (*D.P., supra*, at pp. 1288–1289; *M.H., supra*, at pp. 1300–1302; *Lauren R., supra*, at p. 846.) Furthermore, *Sarah S.*, cited by *D.P.* at page 1293 and *M.H.* at page 1303 for this proposition, instead stated, "[W]e conclude the preference afforded by section 361.3 applies to placements made before the juvenile court has terminated reunification services." (*In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 (*Sarah S.*).)

In *Maria Q.*, the court recognized, "'Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period.'" (*Maria Q., supra*, 28 Cal.App.4th at p. 592, citing *In re Joseph T.* (2008) 163 Cal.App.4th 787, 795 & *Sarah S., supra*, 43 Cal.App.4th at p. 285.)

25.

*Joseph T.* analyzed the issue and explained, in part, "During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court. [Citation.] This was the law at the time subdivision (d) [of section 361.3] was enacted and there is nothing in the plain language of the subdivision to change that law." (*Joseph T., supra*, at p. 795.)[11]

In addition, several cases have applied the relative placement preference after the termination of reunification services but before the termination of parental rights, even though a new placement was not required. This is the relief maternal grandparents seek in this case. However, integral to the late-stage application of the preference in those cases was a combination of the agencies' failure to discharge their statutory duties *and* the relatives' timely request for placement early in the proceedings.

In *R.T.*, the court explained, "It is presently unsettled whether a relative is entitled to preference when requested late in the proceedings, when the child is in a stable placement following the dispositional hearing and termination of reunification services" (*R.T., supra*, 232 Cal.App.4th at p. 1300), but the court found that "issue has no bearing … where the relatives invoked the preference *before* the dispositional hearing, the agency and court failed to apply it at disposition, and the error was timely raised by a section 388 motion" (*ibid.*). Subsequently, in *Isabella G.*, the appellate court concluded "the record in this case is more egregious than in *R.T.*" (*Isabella G., supra*, 246 Cal.App.4th at p. 722.) In *Isabella G.*, the grandparents, with whom the child had a relationship, repeatedly requested placement beginning before the detention hearing and the agency repeatedly failed to discharge its statutory duty to assess them. (*Id.* at pp. 722–723.)

---

**11** Subdivision (d) of section 361.3 provides, "Subsequent to the hearing conducted pursuant to Section 358, whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements. In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child."

Once the grandparents brought a section 388 petition, the agency argued it was too late. (*Isabella G., supra*, at p. 722.) Given that the grandparents had sought placement from the outset of the dependency proceeding and the agency failed to comply with its statutory duty to assess them, the appellate court concluded the relative placement preference applied. (*Id.* at pp. 722–723.)

More recently, in a case cited by neither maternal grandparents nor the agency, the appellate court recognized, "A number of courts have also applied the relative preference to the period between termination of reunification services and termination of parental rights, in circumstances like those present here, where the relative requested placement early in the process and the delay in assessing placement was due to failures by [the agency] and the court." (*N.J., supra*, 104 Cal.App.5th at p. 125.) In that case, the child's aunt requested placement the day the child was ordered detained, which was one day after the mother gave birth, and the agency repeatedly failed to apply the relative placement preference. (*Id.* at pp. 121–122.) The appellate court concluded, "We agree with [the] mother that the relative placement preference applied in light of the extensive failures by [the agency] and the court and [the] aunt's early and repeated requests for placement." (*Id.* at p. 122.)

Turning to the parties' arguments, the agency relies on *J.Y.* to support its position that the relative placement preference does not apply, postreunification. In that case, however, the appellate court found that "the Department *fully complied* with its obligation to assess family members for placement during the reunification period" (*J.Y., supra*, 76 Cal.App.5th at p. 479, italics added), and the juvenile court erred in ordering placement with the Arizona relatives based on an "unfounded conclusion that the Department failed in its duty under … section 361.3 to give preferential consideration to *other* relatives in California (not the Arizona relatives) who requested placement 'back when the parents were receiving reunification services'" (*id.* at p. 476). The court concluded, "The trial court abused its discretion by setting a section 361.3 hearing after

the reunification period ended, where the Department had fulfilled its obligations to assess relatives for placement during reunification, and there was no need to change J.Y.'s placement. With no legal authority to do so, the court ordered J.Y. be uprooted from his stable and loving placement—after the court had declared adoption was the plan, and the de facto parents wanted to adopt him—to place him with virtual strangers." (*Id.* at p. 484.)

In this case, there is no question that the agency failed to discharge its family finding duties. Although the agency took some action concerning individuals specifically identified by mother, it did not conduct any investigation to identify, locate and notify other relatives of P.M., including maternal grandparents and maternal great-grandmother, who had custody of mother's older son. Both the agency and the juvenile court acknowledged this failure. Therefore, *J.Y.* is distinguishable on this material point. Nevertheless, we also conclude that *Isabella G.*, which recognized an exception maternal grandparents urge us to apply in this case, is distinguishable.

In this case, as we have stated, there is no question the agency failed to fulfill its statutory obligation to investigate and notify P.M.'s relatives, other than those identified by mother. However, although maternal grandparents knew of mother's pregnancy and became aware of this dependency proceeding in June 2024, they did not attempt to form any relationship with P.M. following his birth and they did not contact the agency to seek placement of him until October 2024, after reunification services were terminated and the matter set for a hearing under section 366.26. The main driver in the cases applying the limited exception maternal grandparents seek to avail themselves of was the agency's failure to comply with statutory duties in the face of early, repeated efforts by relatives to seek placement. That is, the agency failed to comply with the law despite knowing a relative was timely seeking placement under the statute. Maternal grandparents do not cite to any cases or develop a legal argument that supports application of the relative placement preference at this late stage, when the child is in a safe, stable placement with

caregivers to whom he is deeply bonded, the relatives were aware of the child's placement in foster care prior to the termination of reunification services but did not act, and the error is confined to the agency's failure to exercise due diligence. Given these distinctions, we are not persuaded this case presents the circumstances that informed the decisions in *N.J.*, *Isabella G.*, and *R.T.*

Maternal grandparents cite *Sarah S.* for the proposition that section 361.3 applies until parental rights are terminated, but, as stated, the court instead found "the preference afforded by section 361.3 applies to placements made before the juvenile court has terminated *reunification* services." (*Sarah S., supra*, 43 Cal.App.4th at p. 285, italics added.) Maternal grandparents also cite *K.B.* for the proposition that "courts may order reassessment when agencies fail to notify relatives." (Citing *K.B., supra*, 97 Cal.App.5th at pp. 697–698.) *K.B.*, however, involved the mother's timely appeal of the juvenile court's disposition order finding the agency exercised due diligence in identifying, locating, and contacting the children's relatives under section 309 and rule 5.534(b)(3). (*K.B., supra*, at p. 695.) Thus, the mother timely challenged the due diligence finding made at the disposition hearing and, in that circumstance, a finding of error was remediable through an order to exercise due diligence in compliance with section 309 and rules 5.534 and 5.695. Here, there was no timely appeal of the juvenile court's disposition orders and maternal grandparents may not, through this appeal, reach back and unwind those now-final orders.

Without question, the agency should have notified maternal grandparents and other relatives in writing, in compliance with the statute. *R.T.* specifically rejected the argument that oral notice was sufficient, explaining, "[T]he statute explicitly requires 'written notification' and, in addition, oral notification 'whenever appropriate.' (§ 309, subd. (e)(1).) There is little reason to believe that the oral advisements sufficiently informed the relatives of the many aspects of the placement process that the statute requires be conveyed in writing." (*R.T., supra*, 232 Cal.App.4th at p. 1296.) Therefore,

the juvenile court's reasoning that because maternal grandparents became aware P.M. was in foster care in June 2024, any failure to comply with section 309 was harmless is unpersuasive. This reasoning is further undermined by the fact that maternal grandparents acted immediately once they understood that termination of mother's parental rights was imminent. There is no reason to doubt they would have also acted swiftly had they received timely notice in compliance with section 309.

Nevertheless, maternal grandparents were aware that P.M. was in foster care prior to the termination of reunification services, but they did not get involved despite mother's history and the placement of her older son with maternal great-grandmother. Further, neither mother nor P.M. appealed following the dispositional orders or the order terminating reunification services on the ground that the agency had not exercised due diligence in discharging its family finding efforts. (See *K.B., supra*, 97 Cal.App.5th at p. 693.) We recognize this is likely because mother was not, at that time, interested in connecting with maternal grandparents or having P.M. placed with them. Irrespective of her reasons, we cannot now reach back in time to those proceedings, as we have explained, and we are not persuaded that the reasoning underlying the decisions in *N.J.*, *Isabella G.*, and *R.T.* applies here. Regardless, even if we assume the relative placement preference applied due to the agency's failure to discharge its duties to identify, locate, and notify P.M.'s relatives, it was not prejudicial.

### 3. Prejudice

Maternal grandparents' arguments focus on placement with relatives as presumptively best and the relief they seek is not another hearing, but an order removing P.M. from his home with de facto parents and placing him with them in Idaho. Even where applicable, however, the relative placement preference is not an evidentiary presumption, and in *N.J.*, *Isabella G.*, and *R.T.*, the remedy for the error was not immediate placement, but remand for a hearing under section 361.3. (*N.J., supra*, 104 Cal.App.5th at pp. 130–131; *Isabella G., supra*, 246 Cal.App.4th at pp. 724–725; *R.T.,*

*supra*, 232 Cal.App.4th at pp. 1308–1309.) As *R.T.* recognized, "[W]hat is in the child's best interests at this point, almost two and one-half years after his birth, may well differ from what would have been his best interests when he was still an infant. The passage of time may have strengthened R.T.'s bonds with his caretakers and other circumstances may have developed that bear on an evaluation of his best interest. Meaningful redress for past mistakes may not be possible, but we cannot unwind the clock. The interests of stability and continuity may or may not prevail over familial bonds. This difficult question must be decided in the first instance by the juvenile court under the governing legal standards, which must be applied to the circumstances as they exist at the time of the hearing on remand." (*R.T., supra*, at p. 1308.)

An erroneous conclusion that the relative placement preference does not apply is prejudicial, necessitating reversal for further proceedings, only if "there is a reasonable probability of a different result absent that error." (*N.J., supra*, 104 Cal.App.5th at p. 127, citing *In re Celine R.* (2003) 31 Cal.4th 45, 59–60 & *Isabella G., supra*, 246 Cal.App.4th at pp. 723–724; accord, *Maria Q., supra*, 28 Cal.App.5th at pp. 599–600.) The agency argues that even if the relative placement preference applied postreunification but pre-termination of parental rights, the juvenile court considered the statutory factors, rendering any error harmless. Maternal grandparents respond that the juvenile court's analysis was incomplete and the court did not consider all of the factors under section 361.3.

In determining whether to place a child with relatives under section 361.3, "the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors:

> "(1)  The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.

> "(2)  The wishes of the parent, the relative, and child, if appropriate.

"(3)    The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.

"(4)    Placement of siblings and half siblings in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings, as provided in Section 16002.

"(5)    The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.

"(6)    The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful.

"(7)    The ability of the relative to do the following:

"(A)    Provide a safe, secure, and stable environment for the child.

"(B)    Exercise proper and effective care and control of the child.

"(C)    Provide a home and the necessities of life for the child.

"(D)    Protect the child from their parents.

"(E)    Facilitate court-ordered reunification efforts with the parents.

"(F)    Facilitate visitation with the child's other relatives.

"(G)    Facilitate implementation of all elements of the case plan.

"(H)  [¶]  (i)  Provide legal permanence for the child if reunification fails.

"(ii)    However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.

"(I) Arrange for appropriate and safe childcare, as necessary.

"(8)  [¶]  (A)  The safety of the relative's home…."  (§ 361.3, subd. (a).)

As we have stated, "Despite this long list of evidentiary considerations, the relative placement preference statute is often misstated or misunderstood as operating as an evidentiary presumption in favor of placement with a relative. (*Stephanie M., supra*, 7 Cal.4th at p. 320.) Section 361.3 only expresses 'a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child.' (*Stephanie M.*, at p. 320.)" (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 491 (*Amber G.*).)

In this case, the court spoke to the factors under section 361.3. The fourth factor, sibling or half-sibling placement in the same home did not apply, and the court did not expressly address the third factor, Family Code provisions. However, the court addressed the other six factors, acknowledging mother's stated wish that P.M. be placed with maternal grandparents, finding no reason to believe maternal grandparents were not of good character or that they would not have the ability to provide for P.M., and finding no concerns with the safety of their home or their ability to care for P.M. Maternal grandparents also desired to adopt P.M., but the court recognized they were "virtual strangers to [P.M.]" The court was also not persuaded that the benefits of placement with relatives outweighed the stability of his placement with de facto parents, as Kantner testified and maternal grandparents' counsel argued, and the court concluded that removal from placement with de facto parents was not in his best interest.

At their core, maternal grandparents' objections arise from their disagreement with the court's analysis rather than because the court failed to consider factors that might have changed the outcome, disregarded material facts, or otherwise abused its discretion. They emphasize that "[p]lacement with a suitable relative is presumptively in the child's best interest." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1060 (*Esperanza C.*).) The decision in *Esperanza C.*, however, does not support maternal grandparents' claim of prejudicial error in this case, with placement of P.M. with them as the appropriate remedy.

*Esperanza C.* concerned maternal relatives who sought placement of the child from the outset of the dependency proceeding, but who were denied placement based on the agency's determination that maternal great-uncle had a nonexemptible criminal conviction. (*Esperanza C., supra*, 165 Cal.App.4th at p. 1050.) The mother and the child challenged this conclusion in a section 388 petition, and the juvenile court concluded that while the agency erred in finding maternal great-uncle's conviction was nonexemptible, it lacked jurisdiction to review the agency's conclusion. (*Esperanza C., supra*, at p. 1051.) The mother and the child then appealed, and the appellate court concluded the juvenile court had jurisdiction to review the agency's determination. (*Id.* at p. 1049.) As a result, the court reversed the denial of the section 388 petition and the order terminating parental rights, and remanded the matter for a hearing on the petition. The appellate court noted that these maternal relatives came forward immediately and requested placement, there were no other relatives to consider, and child, who was one of the appellants, was "entitled to a 'fair chance' to be placed with her natural family." (*Esperanza C., supra*, at p. 1062.)

These considerations informed the court's conclusion (*Esperanza C., supra*, 165 Cal.App.4th at pp. 1060, 1062), but "cases are not authority for propositions not considered" (*People v. Brown* (2012) 54 Cal.4th 314, 330), and the narrow issue decided in *Esperanza C.* was whether the juvenile court had jurisdiction to review the agency's determination that maternal great-uncle's criminal conviction was nonexemptible. If the juvenile court determined on remand that the agency abused its discretion in the exemption process, the remedy was an order directing the agency to consider maternal great-uncle's exemption request under the correct legal standard. (*Esperanza C., supra*, at p. 1050.) *Esperanza C.* did not decide any questions concerning the relative placement

preference and did not decide any other issues that support maternal grandparents' claims in this case.[12]

"'The overriding concern of dependency proceedings … is not the interest of extended family members but the interest of the child. "[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.""'" (*Amber G., supra*, 86 Cal.App.5th at p. 493.) "Whether to *remove* a child thriving in a placement with nonrelatives to live with relatives is often a difficult and deeply factual question. As noted by one treatise, there is conflicting research about the 'benefits of allowing children to be placed with family whenever possible' versus the 'benefits of stable, continuous placement.' (Seiser & Kumli, Cal. Juvenile Court Practice and Procedure (2021) § 2.127[3], p. 2-499.) 'Until the [L]egislature is able to provide more specific guidance, courts and agencies will continue to struggle with this issue and hand down inconsistent decisions when caregivers and relatives fight over custody. In the meantime, the best remedy is for all parties to do the necessary work upfront. Relatives who come forward in a timely manner who cannot otherwise take immediate placement due to distance or other extenuating circumstances must be immediately identified as the concurrent plan. These relatives must be encouraged by all parties to visit frequently and have regular contact with the children, and expectations must be made clear to the caregivers. Relatives should regularly ask for and receive updates as to the children's well-being and, to the extent allowable, the progress of the case. Similarly, relatives who learn their relatives have been placed in care and who do not come forward

---

[12] Notwithstanding the existence of important distinctions between the child's rights and interests at issue in *Esperanza C.* and maternal grandparents' interests in this case (see *Esperanza C., supra*, 165 Cal.App.4th at p. 1053), *Esperanza C.* has in common with *N.J.*, *Isabella G.*, and *R.T.* an error that affected a placement request made by relatives at the outset of the dependency proceeding (*Esperanza C., supra*, at p. 1062). As discussed, this case does not involve the same factors that informed the decisions in *N.J.*, *Isabella G.*, and *R.T.*

for the placement in a timely manner must be prepared to face the reality they may be denied placement.'" (*Id.* at pp. 491–492.)

Even though the juvenile court concluded the relative placement preference did not apply, given the facts in this case and the court's consideration of the statutory factors, we are not persuaded that its conclusion the statute did not apply resulted in a miscarriage of justice requiring remand for a hearing under section 361.3. As we have discussed, maternal grandparents did not have any relationship with P.M. until they learned mother's parental rights were going to be terminated and although mother subsequently expressed her wish that he be placed with maternal grandparents, which the court credited, she did not ask the agency to assess them for placement, as she did with maternal grandmother, maternal sister, the A.'s, and the Z.'s. She also disclosed having a troubled relationship with maternal grandfather and although she later denied it, CPS referrals involving mother, maternal brother, and maternal grandfather were documented.[13] Although the court found no reason to doubt the moral character of maternal grandparents or the safety of their home, by the time they sought placement of P.M., he had long been in a safe, stable placement with de facto parents; he was bonded to them as a child is bonded to the only parents the child has known; and they had shown themselves to be capable of and devoted to caring for him and addressing his developmental delays. (See *Lauren R., supra*, 148 Cal.App.4th at p. 855 ["'[r]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected'"]; see also *J.Y., supra*, 76 Cal.App.5th at p. 484 [abuse of discretion to "uproot[] [child] from his stable and loving placement—after the court had

---

[13]    It is concerning that the record was not further developed on this issue or the issue of maternal grandfather's domestic violence conviction, but these issues are not factors that weigh in favor of placing P.M. with maternal grandparents.

declared adoption was the plan, and the de facto parents wanted to adopt him—to place him with virtual strangers"].)

As well, mother and maternal grandmother had an ongoing relationship with P.M. that de facto parents expressed commitment to continuing. Thus, placing P.M. out-of-state would not only traumatize him through his removal from the only home he had ever known, but it would effectively sever the bond with mother and maternal grandmother that was being fostered through visits.

Given the foregoing circumstances, we conclude any error in finding the relative placement preference inapplicable was harmless because there is no reasonable probability of a different result absent the error. This is neither a situation where the juvenile court only considered the child's best interests more generally and failed to consider the factors under the relative placement preference nor a situation where the court's conclusion led it to disregard relevant factors that could have led to a different result. (See *R.T., supra*, 232 Cal.App.4th at pp. 1300–1301 [juvenile court applied generalized best interest test unguided by the relevant statutory criteria and error not harmless because "court may well have reached a decision more favorable to the relatives had it considered the relative placement preference"]; accord, *N.J., supra*, 104 Cal.App.5th at pp. 128–129 [failure to independently assess statutory factors was prejudicial where a number of relevant factors favored the relative, but the evidentiary record was not developed because the agency did not provide many details and the relative did not testify or provide a declaration]; *Isabella G., supra*, 246 Cal.App.4th at pp. 723–724 [application of generalized best interest test unguided by statutory factors was prejudicial where relative cared for child for almost two years and child missed relative and was happy with her].)

## III.     Denial of Section 388 Petition

### A.     Legal Principles

"The grant or denial of a section 388 petition is reviewed for abuse of discretion." (*R.T., supra*, 232 Cal.App.4th at p. 1300.)  "A proper exercise of discretion is '"not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles … to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice."'  [Citation.]  Exercises of discretion must be '"grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue."'  [Citation.]  '"The denial of a section 388 motion rarely merits reversal as an abuse of discretion."'"  (*D.P., supra*, 92 Cal.App.5th at p. 1291.)

To obtain relief under section 388, maternal grandparents had to show, by a preponderance of the evidence, that as a result of new evidence or changed circumstances, changing P.M.'s placement from de facto parents who planned to adopt him to placement with maternal grandparents was in his best interest.  (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1079–1080; accord, *Stephanie M., supra*, 7 Cal.4th at p. 317; *D.P., supra*, 92 Cal.App.5th at pp. 1294–1295.)  The best interest determination involves "'[l]ooking at a [n]umber of [f]actors.'  [Citation.]  First, courts look at the 'seriousness of the reason for the dependency in the first place' and the 'reason that problem was not overcome by the final review.'  [Citation.]  Second, they evaluate 'the strength of a child's bond to his or her present caretakers, and the length of time a child has been in the dependency system in relationship to the parental bond.'  [Citation.]  '[T]he disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion.'  [Citation.]  Finally, courts assess 'the nature of the change, the ease by which the change could be brought about, and the reason the change was not made before bear on any such motion.'  [Citation.]  'In any custody determination, a primary consideration

in determining the child's best interests is the goal of assuring stability and continuity.' [Citation.] '"When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child."'" (*D.P., supra,* at p. 1295.)

For the reasons discussed in the context of finding any error harmless under section 361.3, we find no abuse of discretion in the juvenile court's determination that changing P.M.'s placement from de facto parents to maternal grandparents was not in his best interest. P.M. had bonded with de facto parents, with whom he had lived since January 2024, and they were providing him with a stable, secure, loving home with plans for permanency through adoption. SW described de facto parents' level of care, which included addressing his autism-related developmental needs, as "above and beyond." As mentioned, although not specifically discussed by the juvenile court, the record reflects that mother and maternal grandmother, with whom P.M. had a relationship, resided in the same county as de facto parents and de facto parents had expressed commitment to facilitating a relationship between P.M. and his family members. Maternal grandparents, in contrast, reside out-of-state and a change in placement would not only result in the removal of P.M. from the only home he has ever known, but it would remove him from close proximity to mother and grandmother, with whom he has existing bonds.

Maternal grandparents' position that P.M.'s placement with them would be in his best interest is founded on the fact that he is their grandson, but that factor does not establish that it would be in his best interest to be removed from his stable, loving home with de facto parents and placed with family members with whom his only connection is several video visits. "'"'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.'"'" (*Amber G., supra*, 86 Cal.App.5th at p. 496, quoting *Stephanie M., supra*, 7 Cal.4th at pp. 318–319.) Here, it did not. This case involved a developed evidentiary record with testimony by both maternal grandfather and

maternal stepgrandmother, and the juvenile court considered the evidence, discussed relevant factors and concluded that it is not in P.M.'s best interest to be removed from his placement with de facto parents.[14] We find no abuse of discretion. (See *D.P., supra*, 92 Cal.App.5th at p. 1296 ["[T]he juvenile court was in the best position to 'make the hard call' of determining which placement, between two options, was in D.P.'s best interest. [Citation.] Substantial evidence supports its decision that D.P. should remain with the de facto parents."]; *M.H. supra*, 21 Cal.App.5th at pp. 1305, 1306 ["The court was faced with two good options: both the de facto parents with whom the minor had lived since shortly after birth and the great-aunt who cared for the minor appeared willing and able to provide the minor with a loving home," but "[f]aced with the successful bonding of the minor with the de facto parents, and the uncertainty of how the minor would respond to removal from the parental figures he had known since birth, we cannot say that the court abused its discretion in concluding that his continued placement was in his best interest."].)

## DISPOSITION

The juvenile court's order denying maternal grandparents' section 388 petition is affirmed.


MEEHAN, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DESANTOS, J.

---

**14** Although maternal grandparents are proceeding in pro. per. on appeal, they were represented by counsel in the juvenile court.